**CONTINUATION IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Andrew DeCoster, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

**INTRODUCTION**

1.      I have been employed as a Special Agent of the FBI since 2018 and am currently assigned to the Detroit Division.  My duties include the investigation of alleged violations of federal criminal laws, including matters involving violations of 18 U.S.C. §§ 2252A(a)(2), which makes it a crime to receive or distribute child pornography in, or using a facility of, interstate or foreign commerce; and 2252A(a)(5)(B), which makes it a crime to possess or knowingly access with intent to view child pornography.  These items are more particularly described in Attachment B.

2.      Pursuant to the provisions of 18 U.S.C. § 2256(8), "child pornography" means a visual depiction, the production of which involves the use of a minor engaging in sexually explicit conduct, including but not limited to various simulated or actual sex acts, or the lascivious exhibition of the genitals or the pubic area.

3.      This continuation is submitted in support of an application, under Rule 41 of the Federal Rules of Criminal Procedure, for a search warrant for the locations specifically described in Attachment A, including Instagram accounts **here_we_stand_9,    jame.sr3675,    jamesrr729,    killabea3,    killalocr, killaman4589,  olivia9994916,  slayeer8,** and **systemdown18880 ("Target**

-1-

**Accounts")**. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

4.      The statements contained in this continuation are based in part on information provided by U.S. federal law enforcement agents, written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement officers, information gathered from investigative sources of information, and my experience, training, and background as a Special Agent.

5.      This continuation is submitted for the limited purpose of securing a search warrant.  I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of federal law are located at the **Target Accounts.**

## FACTUAL BACKGROUND OF INVESTIGATION

6.      On March 23, 2022, Victim 1[1] submitted an online tip to the FBI National Threat Operations Center (NTOC) indicating she was being extorted for explicit photos by someone who referred to himself in online interactions as "Chris Medina."

_____

[1] Victim 1's full name is known to me, but I have omitted that information to protect her identity.

7.     On March 25, 2022, I interviewed Victim 1 telephonically. When Victim 1 was approximately 16 or 17 years old, approximately in 2017, she sent sexually explicit images to the person she knew online as "Chris Medina" via Instagram and Snapchat.[2]  Originally, Victim 1 communicated with Medina through the Instagram account **here_we_stand_9**.  At least one of the images included nudity when she was a minor.  Medina threatened to kill himself if Victim 1 did not send sexually explicit photographs of herself.  After approximately six months from the first interaction with Medina, Victim 1 blocked accounts attributed to Medina.

8.     In a later interview, Victim 1 said she took at least ten sexually explicit photos of herself when she was under the age of 18 and sent them to Medina.  Some of the photos included her bare breasts.  Other photos were nude photos of her genital area.  Medina directed Victim 1 to pose in some of the pictures.  Victim 1 remembered posing in the bathroom on a sink with one of her legs up, as well as taking photos "from the back" and "laying down."

9.     Since 2017, other accounts, suspected to be Medina, attempted to extort Victim 1 for more sexually explicit photographs.  Those accounts threatened to send Victim 1's sexually explicit images to her friends, co-workers, and family members if

---

[2] Snapchat and Instagram are social media platforms that allow users to share moments with photos, videos, and chats/messages.  More detailed background information regarding Instagram and Snapchat is provided in the separate background sections below.

she did not send photographs and/or videos of Victim 1 and her current boyfriend having sex.

10. On March 29, 2022, Victim 1 identified Snapchat accounts j_st22738, jkl_ll2022, and jkolivia22 as being attributable to the person she knew as Medina. Victim 1 identified Instagram accounts **here_we_stand_9**, **olivia9994916**, and **slayeer8** as being attributable to Medina. Victim 1 suspected these accounts were attributable to Medina due to common language and topics of conversation, including references to previous explicit photographs and threats to expose the photographs. Additionally, on one account, the user indicated he would keep making "ghost accounts."

11. On April 5, 2022, I interviewed Victim 1 at the FBI Lansing Resident Agency. Victim 1 reiterated she was under the age of 18 when she sent sexually explicit photos (including of her genital area) to Medina. Victim 1's father provided a flash drive that contained messages between Victim 1 and a user suspected to be Medina.

12. A review of the flash drive included screenshots of a conversation between Victim 1 and a Snapchat profile attributed to be Medina—account j_st22738. Medina said, "And i have a lot … Of pics even ones that u sent that show your face." Medina said, "[First name of Victim 1] u sent me a shit load when we were together." Victim 1 replied, "I was also a minor," to which Medina replied, "U know i have them i even showed ur ex friend or friend who was in the military [sic]."

-4-

13.     Victim 1 was last contacted by Instagram account **slayeer8**, attributed to Medina, on or about May 23, 2022.  In the conversations, Medina said, "do you think [relative of Victim 1] will like your nudes ... or lee .. Madison."  After Victim 1 responded, Medina said, "your step dad might like them ... [relative of Victim 1] might get a kick of them ... lets find out."

14.     Victim 1 also identified Victim 2[3] as another victim of Medina. According to Victim 1, several years ago, Victim 2 texted Victim 1 to "back off" Medina because they were in a relationship together.  At an unknown date later, Victim 2 apologized to Victim 1 and said she was also manipulated by Medina.

15.     On April 12, 2022, I interviewed Victim 2 at the FBI Lansing Resident Agency.  In approximately 2017, Victim 2 was 17 years old and received a message from a person who identified himself online as "Chris Peterson" via Instagram account **here_we_stand_9**—the same Instagram account that Victim 1 used to communicate with "Chris Medina."  Victim 2 told Peterson she was 17 years old. Victim 2 also communicated with Peterson on other Instagram accounts and on Snapchat account ek1572 for approximately four and a half years when they were in an online relationship.

16.     Victim 2 indicated she sent sexually explicit photographs of herself to Peterson over Snapchat.  Peterson instructed Victim 2 to "do things," which included

---

[3] Victim 2's full name is known to me, but I have omitted that information to protect the identity of the victim.

masturbation.  Victim 2's pictures were "very nude," and included pictures of her breasts and "lower parts," by which I believe she means her pubic area.  Some of these photographs were taken when Victim 2 was under 18 years old.  Peterson threatened to break up with Victim 2 if she did not send sexually explicit photos to him or find two other people to have sex with on camera.  Victim 2 later broke up with Peterson and blocked his accounts.

17.    Peterson also sent Victim 2's sexually explicit photographs to Victim 2's mother via Snapchat.

18.    On April 12, 2022, I interviewed Victim 2's mother at the FBI Lansing Resident Agency.  Victim 2's mother provided copies of conversations between her and Peterson.

19.    Victim 2's mother identified Instagram accounts **here_we_stand_9**, **jamesrr729**, **killaman4589**, **killabea3**, **killalocr**, **systemdown18880**, and **jame.sr3675** as attributable to Peterson.  Victim 2's mother identified Snapchat account ek1572 as attributable to Peterson. Victim 2's mother identified Kik[4] account EasyE81 as attributable to Peterson.  Victim 2's mother attributed all the identified accounts to the person she knew as Peterson due to the context of the conversations,

---

[4] Kik is a smartphone messenger application that lets users connect with their friends and the world around them through chat. Users can send text, pictures, videos and more – all within the app. Kik is available for download through the iOS App Store and the Google Play store on most iOS (iPhone/iPod/and iPad) and Android (including Kindle Fire) devices. Users may also be using Kik on their Windows, Symbian-based or BlackBerry OS. Kik is free to download and uses an existing Wi-Fi connection or data plan to send and receive messages.

specifically regarding the ability to post pictures of Victim 2, and the continuation of discussions across the various accounts.

## IDENTIFYING "CHRIS MEDINA"/ "CHRIS PETERSON" AS EDUARDO CHORA

20. For the reasons outlined in this section below, law enforcement has identified Eduardo or Ed Chora as the person the victims knew as "Chris Medina" and "Chris Peterson."

21. Based on the information provided above from Victim 1, Victim 2, and Victim 2's mother, on or about April 15, 2022, investigators served an administrative subpoena on Snapchat for subscriber records of accounts j_st22738, jkl_ll2022, jkolivia22, and ek1572.

22. On or about May 4, 2022, Snapchat responded with subscriber information and Internet Protocol (IP) logs for accounts j_st22738, jkl_ll2022, jkolivia22, and ek1572. Snapchat's response included email addresses and captured IP logs for all requested accounts. Email addresses gijoey851@gmail.com and edchora63@gmail.com were attributed to account ek1572. Email address edchora63@gmail.com was attributed to account j_st22738. Email address gijoey@gmaip.com, entered with the misspelling of "gmail," was attributed to account jkl_ll2022. Email address juanrambo035@gmail.com was attributed to account jkolivia22.

23.    I am aware that Internet Protocol (IP) is a protocol, or set of rules, for routing and addressing packets of data so that they can travel across networks and arrive at the correct destination.  Data traversing the Internet is divided into smaller pieces, called packets.  IP information is attached to each packet, and this information helps routers to send packets to the right place.    Every device or domain that connects to the Internet is assigned an IP address, and as packets are directed to the IP address attached to them, data arrives where it is needed.[5]

24.    According to the IP logs provided by Snapchat, accounts j_st22738, jkl_ll2022, jkolivia22, and ek1572 all logged into IP address 52.144.117.168 on March 24, 2022.  A search of the internet revealed IP address 52.144.117.168 was registered to MetroNet Inc.

25.    Additionally, on or about April 15, 2022, investigators served an administrative subpoena on Meta Platforms, Inc., the owner and operator of Instagram, for subscriber records of accounts **here_we_stand_9**, **olivia9994916**, **slayeer8**, **jamesrr729**, **killaman4589**, **killabea3**, **killalocr**, **systemdown18880**, and **jame.sr3675**.

26.    On or about May 20, 2022, Meta Platforms, Inc. (Instagram) responded with subscriber information and IP logs for accounts **here_we_stand_9**, **olivia9994916**, **slayeer8**, **jamesrr729**, **killaman4589**, **killabea3**, **killalocr**,

---

[5] https://www.cloudflare.com/learning/network-layer/internet-protocol/

**systemdown18880**, and **jame.sr3675**.  Meta Platforms, Inc.'s response included the email address juanrambo035@gmail.com for several of the accounts, and captured IP logs for the identified accounts.   As discussed above, email address juanrambo035@gmail.com was also identified in Snapchat's May 4, 2022 subpoena response.

27.   According to the IP logs provided by Meta Platforms, Inc. for the identified Instagram accounts, the IP address used for the creation of accounts **slayeer8** and **olivia9994916** was the same IP address used as logins for Instagram account **jamesrr729**.  Additionally, the IP address used for the creation of account **olivia9994916** was the same IP address used for the Snapchat account creations of jkolivia22 and jkl_ll2022.

28.   A review of Snapchat and Meta Platforms, Inc.'s subpoena returns also revealed that IP address 209.249.25.60 was captured as account activity associated with **slayeer8** (Instagram)**, jamesrr729** (Instagram), and ek1572 (Snapchat).  On or about June 8, 2022, the FBI determined that IP address 209.249.25.60 was attributable to Edward W. Sparrow Hospital Association, 1215 E Michigan Ave, Lansing, MI 48912, telephone number 517-364-1000.

29.   One of the IP addresses associated with account activity j_st22738 (Snapchat) was 2607:fb90:88e4:d41e:0:8:b049:7401.   On or about June 9, 2022, investigators served an administrative subpoena to T-Mobile for subscriber information of that IP address.

30.     On or about June 14, 2022, T-Mobile responded with a return, stating the subscriber details for the account associated with IP address 2607:fb90:88e4:d41e:0:8:b049:7401 on March 24, 2022, at 01:50:53 UTC was:

a.  Subscriber Name: Eduardo Chora

b.  Subscriber Address: 3016 Pleasant Grove Rd., Lansing, MI 48910-2306

c.  Phone Model: SAM A20 32G BLK TMUS KIT RSU

d.  Phone Model: SAM J700T WHITE TMUS KIT RSU

31.     On or about June 9, 2022, investigators served an administrative subpoena on Kik c/o MediaLab.ai Inc. for subscriber information and IP activity for Kik account EasyE81—an account identified by Victim 2's mother as being associated with "Chris Peterson."

32.     On or about June 13, 2022, Kik c/o MediaLab.ai Inc. responded with subscriber information and IP logs for Kik account EasyE81.   Email address gijoey851@gmail.com was identified.  Under Registration Client Info, a Samsung SM-A205U was identified.   The IP logs produced by Kik c/o MediaLab.ai Inc. included specific port numbers from previously identified IP addresses, including IP address 52.144.117.168, which was associated with MetroNet Inc.

33.     I am aware that in computer networking, port numbers are part of the addressing information used to identify the senders and receivers of messages.

They are associated with TCP/IP network connections and might be described as an add-on to the IP address.[6]

34.     On or about June 16, 2022, the State of Michigan Department of Labor and Economic Opportunity provided wage records for Eduardo Chora.  The wages were reported to the State of Michigan each quarter.  With the quarter that ended on December 31, 2021, one of the employers listed for Chora was Sparrow Hospital, the site of several of the IP address log-ons by the solicitor described above.

35.     On or about June 16, 2022, investigators served an administrative subpoena on Sparrow Health System's payroll and disbursements department for documentation of dates and times worked by Chora.

36.     On or about June 17, 2022, Sparrow Health System responded with a return of dates and times worked by Chora between approximately October 1, 2021, and June 16, 2022.

37.     The dates and times worked by Chora were compared to social media IP logs associated with Sparrow Hospital's open network IP address 209.249.25.60.  The following accounts had IP log connections to IP address 209.249.25.60: **slayeer8** (Instagram), **jamesrr729** (Instagram), ek1572 (Snapchat), and EasyE81 (Kik).  The IP address was recorded as account activity in these accounts on 66 unique days

---

[6]https://www.techtarget.com/searchnetworking/definition/port-number#:~:text=A%20port%20number%20is%20a,that%20have%20an%20assigned%20number.

between October 27, 2021, and May 19, 2022. Sparrow Health's records confirmed that Chora worked for Sparrow Hospital on all 66 days.

38.     On or about June 16, 2022, investigators served an administrative subpoena on MetroNet Inc. for subscriber information for IP address 52.144.117.168 Port 43416 on May 24, 2022 at 02:04:37 UTC, which was associated with Kik account EasyE81.

39.     On or about June 23, 2022, MetroNet Inc. responded with a return, stating the subscriber details for the account associated with IP address 52.144.117.168 Port 43416 on May 24, 2022 at 02:04:37 UTC were:

a. Subscriber Name: Eduardo Chora

b. Physical Address: 1842 Delevan Avenue, Lansing, MI 48910

c. Phone Number: 517-703-7053

d. Email: edchora63@gmail.com[7]

40.     I conducted an Accurint public records search of Eduardo Chora. The listed telephone number for Chora was 517-703-7053. One of the listed addresses for Chora was 1842 Delevan Avenue, Lansing, MI.

41.     Records from the Michigan Secretary of State showed Eduardo Chora, date of birth November XX, 1991[8], has a driver's license registered to 1842 Delevan

---

[7] This was one of the same email addresses that Snapchat attributed to account ek1572 and j_st22738.

[8] His full date of birth is known to me, but I have redacted it to protect personal identifying information.

Avenue Lansing, MI.  A 2015 Chevrolet Impala, MI license plate DZC6580, is registered to Chora at 1842 Delevan Avenue, Lansing, MI.

42.     Using Chora's identifying information and a comparison of Chora's driver's license photo, I identified Facebook public profile "Eduardo Miguel Chora Santibanez," located at www.facebook.com/eduardo.m.chora, as Chora's.  On June 7, 2022, that profile posted an image of a red Chevrolet Impala.

43.     On June 30, 2022, investigators conducted surveillance at 1842 Delevan Avenue, Lansing, MI**.**  A red sedan, similar to a vehicle observed in Chora's Facebook account, was pulled into a parking spot directly behind 1842 Delevan Avenue, Lansing, MI.  On July 6, 2022, surveillance identified a red Chevrolet Impala, MI license plate DZC6580, registered to Chora, parked in the driveway south of 1842 Delevan Avenue, Lansing, MI.

44.     On June 17, 2022, I sent Meta Platforms, Inc. a preservation request for the **Target Accounts**, and they provided the reference number 7016970.

45.     On July 19, 2022, United States Magistrate Judge Sally J. Berens granted a search warrant application for 1842 Delevan Avenue, Lansing, MI.  (*See* In re: 1842 Delevan Avenue, Lansing, Michigan 48910, 22-mj-321.)  During the search warrant execution on July 29, 2022, Chora was interviewed regarding his conduct and the email addresses, online aliases, and screen names across the various platforms.  Approximately one hour and twenty minutes into the interview, Chora stated, "I'll admit to everything here, okay" and "I did it all. I fucked up."  In summary,

Chora indicated throughout the interview that all the identified email addresses, aliases, and screen names across the various platforms were his, including the **Target Accounts**.

46.    On August 10, 2022, Chora sent an FBI agent an email regarding the search warrant and interview that occurred on July 29, 2022.  In the email, Chora wrote, "… and I was so scared the date I meet you knew I agreed to things I didn't do…"

47.    A cellular phone attributed to Chora was seized during the search warrant execution at 1842 Delevan Avenue.  The FBI's cursory review of the phone showed email address edchora63@gmail.com logged into the phone.  The cloud-based backup on the phone was not enabled.  The FBI did not observe any images of Victim 1 and Victim 2 during this initial review of the phone data.  The phone has been sent to the FBI's Computer Analysis Response Team (CART) for complete device examination.

48.    With respect to this cellular phone, Chora said in his interview during the search warrant execution that he and his wife recently both got new phones when Chora began working at Walmart "a few weeks" ago and that Chora's wife threw away the old phones when they purchased the new ones.  Chora told investigators that his old phone was backed up on his new phone via the Google cloud at his email address edchora63@gmail.com.  As discussed above, the FBI determined that the cloud backup was not enabled, but the phone was logged in with the email address

edchora63@gmail.com.  In my training and experience, given the lack of cloud backup and the newness of the phone, it is not surprising that the FBI's cursory review of the cellular phone did not yield any images of Victim 1 and Victim 2.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

49.     Based on my training, experience, and information obtained from other agents, I know the below statements are accurate.

50.     Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

51.     Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as WiFi or Bluetooth. Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos.

52.     Any computer can connect to any smartphone, tablet, or other computer. Through the internet, electronic contact can be made to millions of computers around the world. Child pornography can therefore be easily, inexpensively, and

anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

53.    The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types - computer hard drives, external hard drives, CDs, DVDs, and thumb, jump, or flash drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices.  Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

54.    The internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

55.    Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the internet. Even in cases where online storage is used, however, evidence

of child pornography can be found on the user's computer, smartphone, or external media in most cases.

56.     Individuals commonly use smartphone and computer apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

57.     Communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## CHARACTERISTICS COMMON TO INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

58.     Based on my knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals interested in a sexual relationship with

children.    Characteristics common to people interested in having a sexual relationship with children include that they:

a.  Generally have a sexual interest in children and receive sexual gratification from viewing children engaged in sexual activity or in sexually suggestive poses, or from literature describing such activity.

b.  May collect sexually explicit or suggestive materials in a variety of media, including in hard copy and/or digital formats.  People with a sexual interest in children oftentimes use these materials for their own sexual arousal and gratification.  They may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse or groom a child to participate in sex, or to demonstrate the desired sexual acts.

c.  May also keep "trophies" or mementos of sexual encounters with children, or items that they use to gratify a sexual interest in children, such as by collecting children's underwear or other items belonging to a child.

d.  May take photographs that either constitute child pornography or indicate a sexual interest in children by using cameras, video cameras, web cameras, and cellular telephones.  Such images and video may be taken with or without the child's knowledge.  This type of material may be used by the person to gratify a sexual interest in children.

e.  Generally, maintain their communication indicating a sexual interest in children and child pornography in a safe, secure, and private environment,

-18-

most often where they live and/or on their person.  These images and videos can be downloaded onto desktop or laptop computers, computer disks, disk drives, data disks, system disk operating systems, magnetic media floppy disks, internet-capable devices, cellular telephones, tablets, digital music players, and a variety of electronic data storage devices (hardware, software, diskettes, tapes, CDs, DVDs, SD cards, memory cards, USB/jump/flash memory devices, external hard drives, and other digital storage media).  The images can be stored in both digital and hard copy format and are usually hidden so that they are not found by other members of the individual's family.

f.  May correspond with and/or meet others to share information and materials; rarely destroy correspondence from others with a sexual interest in children; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, screen names, and telephone numbers of individuals with whom they have been in contact and who share the same sexual interest in children.  Such correspondence may take place, for example, through online bulletin boards and forums, internet-based chat messaging, email, text message, video streaming, letters, telephone, and in person.

## BACKGROUND CONCERNING INSTAGRAM[9]

59.     Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

60.     Meta collects basic contact and personal identifying information from users during the Instagram registration process. This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers. Meta keeps records of changes made to this information.

61.     Meta also collects and retains information about how each user accesses and uses Instagram. This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information

---

[9] The information in this section is based on information published by Meta on its Instagram website, including, but not limited to, the following webpages: "Data Policy," https://help.instagram.com/519522125107875; "Information for Law Enforcement," https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

about devices and web browsers used to access an account, and session times and durations.

62. Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

63. Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service. Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

64. Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide

certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

65.     Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users.  Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions.  Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users.  Users can also manually search for friends or associates.

66.     Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

67.     One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.  Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile.  Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

68.     Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram.  Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@").   An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

69.     An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted.  The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

70.     Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

71.     Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups.  These messages may include text, photos, videos, posts, videos, profiles, and other information.  Participants to a group conversation can name the group and send invitations to others to join.  Instagram users can send individual or group messages with "disappearing" photos or videos

that can only be viewed by recipients once or twice, depending on settings.  Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot.  Instagram Direct also enables users to video chat with each other directly or in groups.

72.     Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps.  Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

73.     Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Meta retains records of a user's search history and followed hashtags.

74.     Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

75.     Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

76.     In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

77.     For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

78.     In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under

investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

79.    For example, the stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, voice messages, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

80.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

81.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

82.    Other information connected to the use of Instagram may lead to the discovery of additional evidence.  For example, associated and linked accounts, stored communications, photos, and videos may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  In addition, stored communications, contact lists, photos, and videos can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

83.    Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## **CONCLUSION**

84.    Probable cause exists to believe that federal criminal laws, including matters involving violations of 18 U.S.C. §§ 2252 and 2252A, which make it illegal to

distribute, transport, receive, possess, and access, with intent to view, child pornography have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located at the location described in Attachment A.

85.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of the warrant.  The government will execute the warrant by serving it on Meta.  Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to them, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

86.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).